**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

---

| | | |
|---|---|---|
| BIRCH\|REA PARTNERS, INC. | : | Civil Action No. |
| 65 William Street, | : | |
| Wellesley, MA 02481, | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SAAVEDRA GOODWIN | : | |
| 312 SE 17th St 2nd Fl | : | |
| Fort Lauderdale, FL 33316 | : | |
| | : | |
| RANDOLPH BROMBACHER, ESQ. | : | |
| 312 SE 17th St 2nd Fl | : | |
| Fort Lauderdale, FL 33316 | : | |
| | : | |
| ROTHBERG LOGAN & WARSCO LLP | : | |
| 505 E Washington Blvd | : | |
| PO Box 11647 | : | |
| Fort Wayne, IN 46859-1647 | : | |
| | : | |
| and | : | |
| | : | |
| ANDREW PALMISON, ESQ. | : | |
| 505 E Washington Blvd | : | |
| PO Box 11647 | : | |
| Fort Wayne, IN 46859-1647 | : | |
| | : | |
| Defendants. | : | |

---

## COMPLAINT

Plaintiff, Birch|REA Partners, Inc. ("Birch|REA") by and through its undersigned counsel files this Complaint against Defendants Saavedra Goodwin, Randolph Brombacher, Esq., Rothberg Logan & Warsco LLP, and Andrew Palmison, Esq. (collectively "Defendants") and says:

Parties.

1.     Birch|REA is a Massachusetts corporation with an address located at 65 William Street, Wellesley, MA 02481 and its principal place of business in Massachusetts.

2.     Defendant Saavedra Goodwin ("Saavedra") is a Florida partnership with an address of 312 SE 17th St., 2nd Floor, Fort Lauderdale, FL 33316.

3.     The partners of Defendant Saavedra are Damaso W. Saavedra, Allyson D. Goodwin, Diane J. Zelmer, Ross D. Kulberg, Jennie L. Conrad, and Glen M. Lindsay. As set forth below, all of the partners of Saavedra are domiciled in and therefore citizens of the State of Florida, and thus Saavedra is a citizen of the State of Florida.

4.     Damaso W. Saavedra is domiciled in and therefore a citizen of the State of Florida. He has an address of 2717 Yacht Club Blvd, Apt. 6B, Fort Lauderdale, FL 33304.

5.     Allyson D. Goodwin is domiciled in and therefore a citizen of the State of Florida. She has an address of 2717 Yacht Club Blvd., Apt. 6B, Fort Lauderdale, FL 33304.

6.     Diane J. Zelmer is domiciled in and therefore a citizen of the State of Florida. She has an address of 2200 Anchor Dr., Fort Lauderdale, FL 33316.

7.     Ross D. Kulberg is domiciled in and therefore a citizen of the State of Florida. He has an address of 6741 SW 128th St., Miami, FL 33156.

8.     Jennifer L. Conrad is domiciled in and therefore a citizen of the State of Florida. She has an address of 15433 71st Pl. N. Loxahatchee, FL 33470.

9.     Glen M. Lindsay is domiciled in and therefore a citizen of the State of Florida. He has an address of 6601 NE 21st Dr., Fort Lauderdale, FL 33308.

10.     Defendant Randolph Brombacher, Esq. ("Brombacher") is domiciled in and therefore a citizen of the State of Florida. He has an address of 5111 S Flagler Drive, West Palm Beach, FL 33480.

11.     Defendant Rothberg Logan & Warsco LLP ("Rothberg") is an Indiana limited liability partnership with an address of 505 E. Washington Blvd., PO Box 11647, Fort Wayne, IN 46859-1647.

12.     The partners of Defendant Rothberg are Mark W. Baeverstad, Michael T.  Deam, J. Rickard Donovan, Dennis F. Dykhuizen, Jared C. Helge, Alexander J. Platte, Jason A. Scheele, Theodore T. Storer, Susan E. Trent, Thomas B. Trent, and Mark A. Warsco. As set forth below, all of the partners of Rothberg are domiciled in and therefore citizens of the State of Indiana, and thus Rothberg is a citizen of the State of Florida.

13.     Mark W. Baeverstad is domiciled in and therefore a citizen of the State of Indiana. He has an address of 6421 Post Rd. Fort Wayne, IN 46814.

14.     Michael T. Deam is domiciled in and therefore a citizen of the State of Indiana. He has an address of 1822 Silver Linden Ct., Fort Wayne, IN 46804.

15.     J. Rickard Donovan is domiciled in and therefore a citizen of the State of Indiana. He has an address of 9925 Agora Drive, Fort Wayne, IN 46804.

16.     Dennis F. Dykhuizen is domiciled in and therefore a citizen of the State of Indiana. He has an address of 10727 Country Wood Trl., Fort Wayne, IN 46845.

17.     Jared C. Helge is domiciled in and therefore a citizen of the State of Indiana. He has an address of 11017 Saint Joe Rd., Fort Wayne, IN 46835.

18.     Alexander J. Platte is domiciled in and therefore a citizen of the State of Indiana. He has an address of 8610 Medicine Bow Run, Fort Wayne, IN 46825.

19.     Jason A. Scheele is domiciled in and therefore a citizen of the State of Indiana. He has an address of 9320 Corporation Dr., Indianapolis, IN 46256.

20.     Theodore T. Storer is domiciled in and therefore a citizen of the State of Indiana. He has an address of 2613 Sumack Ct., Fort Wayne, IN 46818.

21.     Susan E. Trent is domiciled in and therefore a citizen of the State of Indiana. She has an address of 2008 Kensington Blvd., Fort Wayne, IN 46805.

22.     Thomas B. Trent is domiciled in and therefore a citizen of the State of Indiana. He has an address of 2723 Roscommon Dr., Fort Wayne, IN 46805.

23.     Mark A. Warsco is domiciled in and therefore a citizen of the State of Indiana. He has an address of 6003 Hursh Rd., Fort Wayne, IN 46845.

24.     Defendant Andrew Palmison, Esq. ("Palmison") is domiciled in and therefore a citizen of the State of Indiana. He has an address of 8221 Asher Dr., Fort Wayne, IN 46815.

Jurisdiction and Venue.

25.     This Court has subject matter jurisdiction of this civil action under and pursuant to 28 U.S.C. §1332(a)(1) as Birch|REA is a citizen of the Commonwealth of Massachusetts, and two of the Defendants are citizens of the State of Florida, and two of the Defendants are citizens of the State of Indiana, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

26.     Venue is proper in this district under and pursuant to 28 U.S.C. §1391 because two of the Defendants are residents of the State of Indiana, and a substantial part of the events or omissions giving rise to the claim occurred in the State of Indiana.

The Appraisal.

27.     On or around May 16, 2007, Birch|REA was engaged by SunTrust Bank ("SunTrust") to perform a portfolio valuation of certain properties (the "Portfolio"), including a property located at 100 South Washington Street, Marion, IN 46952 (the "Property").

28.     Pursuant to the engagement, Birch|REA prepared for SunTrust an appraisal report for the Property as of May 29, 2007 (the "Birch|REA Report").  The Birch|REA Report is dated August 17, 2007.  A true and correct copy of the Birch|REA Report is attached hereto as Exhibit "A."

29.     The Birch|REA Report was to be used in connection with a SunTrust affiliate's purchase of the Property.  PNC Bank was to provide financing for the purchase.

30.     Birch|REA prepared the Birch|REA Report in adherence to and in full compliance with the Uniform Standards of Professional Appraisal Practice ("USPAP").  A true and correct copy of the USPAP in effect at the time of the appraisal is attached hereto as Exhibit "B."

31.     Specifically, in appraising the Property in accordance with Birch|REA's customary practices based upon its experience and appraisal industry standards, Birch|REA gathered information relative to the Property itself, including physical, legal and financial data, and collected key market information including improved bank branch building sales and lease comparables, demographic trends and other data concerning market conditions.  All of the research and analysis performed by Birch|REA in this regard is referenced in the Birch|REA Report.

32.     Birch|REA also: a) inspected the Property and reviewed a Property Condition Report and an Environmental Site Assessment (ESA) Phase 1; b) reviewed available legal documents deemed relevant to the valuation of the Property; c) reviewed available operating

data; d) investigated regional and local economic and demographic trends; e) reviewed such relevant market-specific data as was found to be available; f) identified and visited numerous properties deemed comparable to the Property; and g) conducted interviews and independent market research.   Birch|REA made comparisons and adjustments as necessary for each comparable property.   Again, the research and analysis that Birch|REA performed regarding these subjects is set forth in the Birch|REA Report.

33.     Using its research, Birch|REA performed a valuation of the Property pursuant to standard methods for property valuation: the income approach and the sales comparison approach.   The cost approach was not used to value the Property due to the older age of the improvements. The sales comparison approach was utilized on an abridged basis and was not relied on in order to arrive at a value conclusion.

34.     The income approach is the most commonly relied upon method for valuing net leased, single tenant commercial properties subject to a long term lease.

35.     The income approach values a property by dividing the net income for a property by an appropriate capitalization rate.

36.     The capitalization rate is determined by analyzing the capitalization rate with regard to comparable sales of similar properties.

37.     In valuing the Property pursuant to the income approach, Birch|REA used a capitalization rate of 6.75% to value the Property (the effective capitalization rate used was 6.89% due to deductions for professional fees and reserves).

38.     Birch|REA determined the appropriate capitalization rate for the Property through extensive research and analysis of comparable sales and properties, which analysis is set forth in the Birch|REA Report.

6

39.     Based on the capitalization rate, Birch|REA valued the Property as of May 29, 2007 using the income approach at $3,230,000.

40.     The final estimate of value, considering all applicable valuation methods was $3,230,000.

41.     Upon completion of the Birch|REA Report, the Birch|REA Report was provided to SunTrust and PNC Bank, and SunTrust and PNC Bank accepted the Birch|REA Report without comment.

42.     By accepting the Birch|REA Report, SunTrust and PNC Bank, which are federally regulated banks, acknowledged that Birch|REA's appraisal of the Property conformed to USPAP as USPAP requires that federally regulated banks review and approve all appraisal reports prior to making a loan in reliance upon a particular appraisal report.

43.     On or about October 19, 2007, the Property sold to an affiliate of SunTrust.  PNC Bank extended a loan in the amount of $2,334,375 to SunTrust in connection with the sale of the Property (the "Mortgage Loan").

Regent Bank's Purchase of the Mortgage Loan.

44.     On or about December 20, 2010, PNC assigned the Mortgage Loan to American Capital Group, LLC, and Regent Bank purchased the Mortgage Loan from American Capital Group, LLC.

45.     Federally regulated banks such as Regent Bank are required by the Office of the Comptroller of the Currency ("OCC") regulations to adhere to USPAP and review and approve all appraisal reports prior to their use.

46.     Furthermore, the OCC has promulgated Interagency Appraisal & Evaluation Guidelines ("Interagency Guidelines") to *inter alia* guide financial institutions in their use of existing appraisals.

47.     The Interagency Guidelines dated December 2, 2010, in effect at the time Regent Bank purchased the Mortgage Loan, state the following at Section XIV – Validity of Appraisals and Evaluation:

> The Agencies allow an institution to use an existing appraisal or evaluation to support a subsequent transaction in certain circumstances. Therefore, an institution should establish criteria for assessing whether an existing appraisal or evaluation continues to reflect the market value of the property (that is, remains valid). Such criteria will vary depending upon the condition of the property and the marketplace, and the nature of the transaction. The documentation in the credit file should provide the facts and analysis to support the institution's conclusion that the existing appraisal or evaluation may be used in the subsequent transaction. A new appraisal or evaluation is necessary if the originally reported market value has changed due to factors such as:
>
> - Passage of time.
> - Volatility of the local market.
> - Changes in terms and availability of financing.
> - Natural disasters.
> - Limited or over supply of competing properties.
> - Improvements to the subject property or competing properties.
> - Lack of maintenance of the subject or competing properties.
> - Changes in underlying economic and market assumptions, such as capitalization rates and lease terms.
> - Changes in zoning, building materials, or technology.
> - Environmental contamination

A true and correct copy of the Interagency Guidelines is attached hereto as Exhibit "C."

48.     The Birch|REA Report valued the Property as of May 29, 2007, not December 2010.

49.     Under the Interagency Guidelines, a new appraisal or evaluation is necessary where there has been a substantial passage of time and there have been changes in underlying economic and market assumptions, such as in capitalization rates and lease terms.

50.     Thus, under the above Interagency Guidelines, Regent Bank was not entitled to rely on the value estimate set forth in the 3½ year old Birch|REA Report, particularly as Regent Bank purchased the Mortgage Loan in 2010 when the United States was in the midst of a significant economic downturn.  The Birch|REA appraisal speaks only to its estimate of the market value as of May 29, 2007 and bears no relationship to any value of the property 3½ years later.

51.     Similarly, the Federal Deposit Insurance Commission ("FDIC") has guidelines which state that banks, such as Regent Bank, should consider the continued relevance of appraisals during high growth periods, and update appraisal reports as necessary.

52.     Regent Bank also failed to follow the FDIC guidelines in purportedly relying upon the Birch|REA Report when it purchased the Mortgage Loan.

53.     In sum, Regent Bank was not entitled to rely upon the Birch|REA Report as to the value of the Property in connection with its purchase of the Mortgage Loan, and based upon the relevant guidelines, rules, and regulations, Regent Bank was aware that it could not rely upon the Birch|REA Report in connection with its purchase of the Mortgage Loan. Further, Regent Bank was never an intended user of the report.

First Service PGP Valuation Appraisal

54.     On November 22, 2010, Regent Bank engaged First Service PGP Valuation ("First Service") to perform an appraisal of the Property in connection with Regent Bank's purchase of the Mortgage Loan.

55.     First Service performed an appraisal of the Property for Regent Bank with an effective date of December 14, 2010.

56.     As set forth in a report submitted to Regent Bank, the First Service appraisal valued the Property at $2,910,000 (the "First Service Report"). A true and correct copy of the First Service Report is attached hereto as Exhibit "D."

57.     The First Service Report was reviewed by B&T Real Estate Consultants ("B&T") pursuant to a review dated December 29, 2010, in which B&T recommended that Regent Bank accept the First Service Report and "accepted" is written at the top of B&T's review.  A true and correct copy of the B&T review is attached hereto as Exhibit "E."

Birch|REA's History with Regent Bank.

58.     On December 7, 2010, Regent Bank engaged Birch|REA to appraise two properties substantially similar to the Property, which properties were part of a 30-property portfolio of appraisals that Birch|REA had prepared in June 2007.

59.     Prior to engaging Birch|REA, Regent Bank, through its then Executive Vice President, David Mazza, requested that Birch|REA use a capitalization rate in the 6.75-7.00% range to value the properties.  The email dated November 19, 2010 evidencing Regent Bank's request is attached hereto as Exhibit "F."

60.     The capitalization rate that Birch|REA used to value the Property was in the range that Regent Bank requested that Birch|REA use for the two substantially similar properties that were the subject of Regent Bank's November 19, 2010 email.

61.     Birch|REA's value conclusion for the two properties however was in the 7.5-7.75% range.   Unhappy with the value conclusion, Regent Bank withheld payment for the appraisals.

62.     Regent Bank withheld payment despite the fact that Birch|REA had prepared the appraisal reports properly, and under the OCC Interagency Guidelines, it is improper for a financial institution to do the following:

- Communicate a predetermined, expected, or qualifying estimate of value, or a loan amount or target loan-to-value ratio to an appraiser or person performing an evaluation;

- Specify a minimum value requirement for the property that is needed to approve the loan or as a condition of ordering the valuation;

- Condition a person's compensation on loan consummation;

- Fail to compensate a person because a property is not valued at a certain amount.

*See* Exhibit C, Interagency Guidelines at p. 4.

63.     Upon being informed that Birch|REA intended to sue Regent Bank to recover payment for the appraisals, Regent Bank ultimately accepted and paid for Birch|REA's appraisals of the two properties.

64.     Regent Bank also acquired a loan in a Colonial Bank portfolio (now owned by United Trust Fund) at the time that Regent Bank acquired the Mortgage Loan. The loan relates to a bank branch located in Doral, Florida that is now leased and occupied by BB&T Bank, and is a performing loan.

65.     Upon information and belief, Regent Bank received a copy of the appraisal report for the Doral, Florida property which used identical valuation and methodology to the Birch|REA Report, and Regent Bank accepted that the report for the Doral, Florida property was in conformance with USPAP.

The Underlying Litigation.

66.     In 2015 or 2016, Stonegate Bank began discussions with Regent Bank regarding a potential acquisition of Regent Bank by merger.

67.     At the time it was discussing the acquisition with Stonegate Bank, Regent Bank considered the Mortgage Loan to be a bad loan despite the fact that the loan was performing.

68.     Regent Bank's position on the Mortgage Loan is evidenced by the fact that the Mortgage Loan is referenced four times in the Stonegate Bank Form 8-k submitted to the FDIC at the time of the merger, and is referenced as a loan to be charged off. A true and correct copy of the Form 8-k is attached hereto as Exhibit "G."

69.     In an attempt to minimize its anticipated losses in connection with the Mortgage Loan, Regent Bank sought to redirect the damage from its bad business decisions onto Birch|REA.

70.     Regent Bank therefore engaged the law firm of Saavedra Goodwin for the purpose of threatening Birch|REA with litigation so that it could extract a settlement from Birch|REA believing that Birch|REA would rather settle than engage in litigation.

71.     The Defendants had in their possession the First Service Report prior to the commencement of the Underlying Litigation and knew that Regent Bank could not have under USPAP and OCC Guidelines relied upon the Birch|REA Report given the passage in time between the Birch|REA Report and the purchase of the Mortgage Loan and knew that Regent Bank did not rely on the Birch|REA Report in acquiring the Mortgage Loan given the existence of the First Service Report.

72.     With an anticipated lawsuit in mind, Randolph Brombacher and Saavedra Goodwin hired John Potter to review both the Birch|REA Report and the First Service Report knowing that both the Birch|REA Report and First Service Report valued the Property correctly (together the "Potter Reviews").  True and correct copies of the Potter Reviews are attached hereto as Exhibit "H."

73.     The Potter Reviews were prepared with an intended outcome in mind so that they could be used to support what Defendants knew would be a frivolous claim against Birch|REA.

74.     Predictably, the Potter Reviews stated that both the Birch|REA Report and the First Service Report were misleading and not in compliance with USPAP.

75.     Prior to commencing the present litigation, Regent Bank sent Birch|REA a copy of a proposed Complaint that it intended to file against Birch|REA relating to Regent Bank's purported reliance on the Birch|REA Report in purchasing the Mortgage Loan.

76.     Upon receipt of the Complaint, Birch|REA sent a letter to Brombacher and Saavedra Goodwin dated May 25, 2016 advising that the proposed Complaint against Birch|REA was frivolous.  A true and correct copy of the May 25, 2016 letter is attached hereto as Exhibit "I."

77.     Birch|REA further informed in the May 25, 2016 letter that it would pursue available remedies to hold Regent Bank and its attorneys accountable if it should file the frivolous Complaint.

78.     Despite knowing that the proposed Complaint was frivolous, and having received Birch|REA's May 25, 2016 letter advising them not to file the Complaint, on July 7, 2016, Regent Bank, through the Defendants, commenced an action against Birch|REA in the United States District Court, Northern District of Indiana at Docket No. 1:16-cv-00262 (the "Underlying Litigation") alleging that Birch|REA's accurate and properly performed appraisal contained misrepresentations that caused Regent Bank to purchase the Mortgage Loan.

79.     The Complaint in the Underlying Litigation contained three counts against Birch|REA: 1) Count I for negligent misrepresentation; 2) Count II for common law/constructive

fraud; and 3) Count III for breach of contract (third party beneficiary). A true and correct copy of the Complaint is attached hereto as Exhibit "J."

80.     Defendant Randolph Brombacher, an attorney for Defendant Saavedra Goodwin and Defendant Andrew Palmison, an attorney for Defendant Rothberg Logan & Warsco LLP filed the Complaint as attorneys for Regent Bank.

81.     Regent Bank, through the Defendants, asserted that the following alleged misrepresentations or inaccuracies supported its claims against Birch|REA:

- Over-reliance on a non-market leaseback sale;
- No comparisons or adjustments for the sale/income approach per each comparable;
- Misuse of the GIM (gross income multiplier) in the sales comparison approach creating a circular analysis in relation to the income approach;
- Failing to adequately segment size with sale and income approaches;
- Discrepancy with the building description;
- Lack of verification of sale and income comparables per inspection or other sources;
- Lack of adequately reporting property history of the subject property that sold in 2004 for $495,000;
- Disregarding obvious market conditions of a declining population and significant losses of manufacturing companies that support the Marion market;
- Misrepresenting the sale as a market sale causing the subject taxes to be extremely inflated.

82.     Even though Regent Bank was not entitled to and did not rely upon the Birch|REA Report in purchasing the Mortgage Loan, the Defendants knew or should have known when they filed the Complaint that none of the foregoing allegations regarding the content of the Birch|REA Report were supported by facts or the applicable law.

83.     First, the contention that Birch|REA failed to comply with USPAP because it did not consider or include reference in its Birch|REA Report to a sale of the Property that occurred on February 3, 2004 has no basis in fact or law.

84.     As Defendants were aware, under USPAP, an appraiser is only required to indicate sales of the Property that occurred in the three years preceding the date of the appraisal; the February 3, 2004 sale occurred more than three years prior to the date of the appraisal (which was as of May 29, 2007) and therefore Birch|REA was not required to reference the February 3, 2004 sale in its Birch|REA Report.

85.     Second, the contention that Birch|REA disregarded "obvious" market conditions regarding the location of the Property is contradicted by the fact that the Birch|REA Report includes several pages analyzing the market conditions of the area where the Property is located, and the Birch|REA Report explains that such conditions were considered when valuing the Property.

86.     Third, the contention that the Birch|REA Report incorrectly treated the sale of the Property to the SunTrust affiliate as a market based arms' length transaction and over-relied on a non-market leaseback sale in its preparation of the Birch|REA Report also had no basis in fact or law, because the Portfolio which included the Property was marketed to institutional buyers in rent constant, auction type format, and competitive bids were solicited by numerous institutional investors.

87.     Two rounds of bidding were required before SunTrust was awarded the Portfolio, and upon bidding, the Property sold to an affiliate of SunTrust for $2,747,500.

88.     The sale of the Property to the SunTrust affiliate was therefore in all respects market-based and arms' length, and Birch|REA prepared the Birch|REA Report accordingly.

89.     As the sale was of public record, Defendants either had knowledge that the SunTrust affiliate's purchase of the Property was a market-based arms' length transaction and/or had the ability to obtain such information prior to purchasing the Mortgage Loan.

90.     Lastly, despite the allegations in the Complaint to the contrary, Birch|REA:

a) performed comparisons and adjustments for each comparable property when using the sale/income approach in the Birch|REA Report;

b) did not misuse the gross income multiplier when valuing the Property pursuant to the sales comparison approach as Birch|REA's use of the gross income multiplier adhered to industry standards;

c) when using the sale and income approach in the Birch|REA Report, adequately segment sized; and

d) verified sale and income comparables that it used for the Birch|REA Report through inspection and/or other sources.

91.     Birch|REA's valuation of the Property is further supported by the fact that not more than 17 months after the SunTrust affiliate purchased the Property, the Property was sold to an affiliate of Miami, Florida based United Trust Fund ("UTF") on April 16, 2009 for $2,788,716, a $41,216 increase from the price at which the Property was sold to SunTrust.

92.     The sale of the Property to UTF is of public record and therefore Regent Bank had knowledge of or should have had knowledge of the sale when it purchased the Mortgage Loan.

93.     Furthermore, between the date on which the Property was sold to the SunTrust affiliate and the date on which UTF acquired the Property, SunTrust received $316,667 in rental income.

94.     Using the re-sale of the Property to UTF, and including the net present value of the 17 months' rent at an identical capitalization /discount rate that was used for the initial sale-leaseback transaction, results in a value for the Property of $3,086,888 – only $143,112, or 4.4%, off the Birch|REA Report's concluded value, which is well within the range of reasonableness.

95.     Lastly, prior to the commencement of the Underlying Litigation, Defendants were in possession of the First Service Report which was prepared for Regent Bank in connection with

16

its purchase of the Mortgage Loan and valued the Property at $2,910,000 further supporting Birch|REA's valuation.

96.     The Defendants were also in possession of the B&T Review of the First Service Report prior to the commencement of the Underlying Litigation, which report was accepted by Regent Bank.

97.     Defendants nonetheless filed a Complaint on behalf of their client Regent Bank that contained false allegations against Birch|REA despite knowing that the Birch|REA Report was performed in accordance with USPAP and knowing that the methodology Birch|REA used to value the Property, including its use of a 6.75% capitalization rate, was appropriate and had been accepted by SunTrust and PNC Bank. Defendants further knew that Regent Bank had requested that Birch|REA use a capitalization rate in that range for appraisals of similar properties and knew that the Birch|REA Report did not contain any misrepresentations.

98.     There was and is simply no evidence that Birch|REA's Report was inaccurate or misleading in any respect, and the Defendants were aware of that at the time the Underlying Litigation was commenced.

99.     Accordingly, each of Regent Bank's claims against Birch|REA in the Underlying Litigation were frivolous and the Defendants knew they were frivolous, especially since, by virtue of its acquisition of the Mortgage Loan, Regent Bank acknowledged that the Birch|REA Report was in compliance with USPAP, or it could not have acquired the Mortgage Loan per the OCC Interagency Guidelines, and in any event, Regent Bank could not have relied upon the Birch|REA Report as it was more than 3 ½ years old at the time Regent Bank purchased the Mortgage Loan.

100.   The Defendants knew that Regent Bank could not succeed on its claims for negligent misrepresentation and fraud, because Regent Bank was required to show under Indiana law that Birch|REA made a material misrepresentation of a past or existing fact which was untrue, but as set forth above, Birch|REA did not make a misrepresentation of material fact in the Birch|REA Report.

101.   The Defendants further knew that Regent Bank's allegation that Birch|REA concealed any alleged fraud was frivolous because: a) Regent Bank was in possession of the Birch|REA Report when it purchased the Mortgage Loan, which report explained Birch|REA's proper methodology for valuing the Property; b) Birch|REA had no knowledge that Regent Bank was relying on the Birch|REA Report in purchasing the Mortgage Loan, that Regent Bank even intended to or did in fact purchase the Mortgage Loan; and c) Regent Bank was not entitled to rely upon the Birch|REA Report under USPAP given that it was 3 ½ years old at the time Regent Bank purchased the Mortgage Loan.

102.   Lastly, the Defendants knew that they could not prove reliance as required under Indiana law, as Regent Bank could not rely upon the Birch|REA Report under USPAP, and did not in fact rely on the Birch|REA Report in purchasing the Mortgage Loan, as it engaged its own appraiser, First Service to perform a valuation of the Property in connection with its purchase of the Mortgage Loan, and the First Service Report confirmed the validity of Birch|REA's methodology and the accuracy of the Birch|REA Report, which was further confirmed by the B&T review.

103.   Similarly, Regent Bank's breach of contract (third party beneficiary claim) was based upon Birch|REA's alleged failure to accurately value the Property and its failure to comply with USPAP.   However, again, as the Birch|REA Report was accurate in all respects and

prepared in accordance with USPAP, the Defendants knew that Regent Bank could not succeed on its breach of contract claim.

104.    On September 2, 2016, Birch|REA filed a Motion to Dismiss Regent Bank's Complaint in the Underlying Litigation on the ground that Regent Bank was not the intended beneficiary of the Birch|REA Report, and therefore as a matter of law Regent Bank was not entitled to rely upon the Birch|REA Report when it purchased the Mortgage Loan.

105.    Birch|REA did not move to dismiss the Complaint on the merits of Regent Bank's claims because Regent Bank had pleaded inaccurate statements that prevented Birch|REA from moving to dismiss on the merits.

106.    After the Court denied Birch|REA's Motion to Dismiss, Birch|REA sent a second letter to the Defendants on August 16, 2017, again advising that the Complaint was frivolous and that it should dismiss the Underlying Litigation.  A true and correct copy of the August 16, 2017 letter is attached hereto as Exhibit "K."

107.    Upon receiving the letter, the Defendants informed Birch|REA that they intended to voluntarily dismiss the Underlying Litigation.

108.    Regent Bank then filed a motion to voluntarily dismiss the Underlying Litigation.

109.    On October 23, 2017, the Court entered an Order dismissing the Underlying Litigation with prejudice.

110.    Birch|REA incurred attorneys' fees in the amount of $37,703.50 in connection with its defense of the Underlying Litigation and suffered further damages as set forth below.

**COUNT I-MALICIOUS PROSECUTION/WRONGFUL USE OF CIVIL PROCEEDINGS**
**against all Defendants**

111.    Birch|REA incorporates by reference all of the above paragraphs as though the same were set forth herein at length.

19

112.    The Underlying Litigation was commenced at the direction of Defendants and was ultimately terminated in favor of Birch|REA.

113.    The Underlying Litigation was commenced and continued by Defendants in a grossly negligent manner and without probable cause until the time the matter was dismissed with prejudice by Defendants upon approval from the Court.

114.    Defendants procured, initiated and pursued the Underlying Litigation against Birch|REA without probable cause and with an improper purpose and malice, as at the time the Underlying Litigation was commenced, Stonegate Bank was acquiring Regent Bank and their clients, the banks, sought to attribute anticipated losses on the Mortgage Loan to Birch|REA despite knowing that Birch|REA was not the cause of those losses.

115.    The Defendants improperly commenced and continued the Underlying Litigation and used their position to wrongfully advance their own interests, so that all defendants could place further pressure on Birch|REA to settle Regent Bank's frivolous claim.

116.    Defendants could not have believed in good faith that there was probable cause for the procurement, initiation and continuation of the Underlying Litigation against Birch|REA.

117.    Defendants knew or should have known that the Underlying Litigation would not be sustained as Regent Bank could not factually and legally sustain their burden of proof that Birch|REA was liable to Regent Bank for negligent misrepresentation, fraud, or breach of contract (third party beneficiary) as the Birch|REA Report was accurate in all material respects, was prepared in full adherence to and compliance with USPAP, and Regent Bank was not permitted to rely upon the Birch|REA Report under USPAP, and did not in fact rely upon the Birch|REA Report.

118.    The Underlying Litigation was commenced for the improper purpose of attempting to extract a settlement from Birch|REA in an attempt to minimize Regent Bank's losses in connection with the Mortgage Loan.

119.    Birch|REA suffered damages as a result of the Underlying Litigation, which includes attorneys' fees in the amount of $37,703.50, plus lost revenue in excess of $200,000 from reputational harm that Birch|REA suffered due to the lawsuit.

120.    The acts of Defendants in commencing and continuing the Underlying Litigation against Birch|REA were willful, wanton and intentional such as to justify the imposition of punitive damages in an amount three times the amount of compensatory damages awarded.

WHEREFORE, Plaintiff Birch|REA Partners, Inc. demands judgment in its favor and against Defendants Saavedra Goodwin, Randolph Brombacher, Rothberg Logan & Warsco LLP, and Andrew Palmison jointly and severally in excess of $75,000.00 plus punitive damages in an amount three times the amount of compensatory damages awarded, costs and such other further relief as the Court deems just and proper.

                                    VEGELER LAW OFFICE LLC

Date: September 6, 2019             By: */s/ Robert Owen Vegeler*
                                        Robert Owen Vegeler, Esq.
                                        110 West Berry Street, Suite 1200
                                        Fort Wayne, Indiana 46802
                                        robert@vegelerlaw.com
                                        *Attorneys for Plaintiff*

                                    WEIR & PARTNERS LLP
                                    Brett A. Datto, Esquire
                                    (*To Be Admitted Pro Hac Vice*)
                                    The Widener Building, Suite 500
                                    1339 Chestnut Street
                                    Philadelphia, PA 19107
                                    Phone: (215) 665-8181
                                    Fax: (215) 665-8464
                                    brett.datto@weirpartners.com